## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ROBERT BOSCH LLC,

     Plaintiff,

v.                                   Case No. 12-11503

SNAP-ON, INC., and
DREW TECHNOLOGIES, INC.,

     Defendants.

_____/

### OPINION AND ORDER CONSTRUING CLAIMS

The matter is before the court for construction of the relevant claims in U.S.

Patent No. 6,782,313 (the "'313 Patent") pursuant to *Markman v. Westview Instruments*,

*Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  Extensive

briefing has been submitted by Plaintiff Robert Bosch LLC and Defendants Snap-on,

Inc., and Drew Technologies, Inc.  The court held a claim construction hearing on July

24, 2013.

### I. INTRODUCTION[1]

This litigation concerns the alleged infringement of the '313 Patent by the Pass-

Thru Pro II, CarDAQ-Plus, and VERUS Diagnostic Platform products which Defendants

Snap-on Inc. and Drew Technologies, Inc., manufacture.  Eberhard Frech and Wolfgang

Wagner invented the '313 Patent and then assigned the Patent to Robert Bosch GmbH,

which subsequently assigned it to Plaintiff Robert Bosch, LLC ("Bosch").  Defendants

---

[1] The facts set forth in the Introduction section provide only background and context.  They do not supplement or supplant the court's construction as set forth in the court's Discussion of the claims.

have alleged counterclaims, seeking a declaratory judgment that the accused products do not infringe the '313 Patent, that the '313 Patent is invalid, and that Bosch has engaged in patent misuse of the '313 Patent.  The lawsuit originated in the Central District of California but was transferred to this court upon Defendants' motion.  The court now turns to the claims presented for construction.

## II. CLAIMS TO BE CONSTRUED

The parties have submitted the following phrases for construction by the court (phrases for construction are underlined, and those construed by themselves and as a part of a larger phrase are double-underlined):

### A. Claim 1

1. An external diagnostic tester for motor vehicles, the motor vehicles having programmable control units with self-diagnostic means, wherein the control units can be connected to the external diagnostic tester via a diagnostic/test plug in the motor vehicle, the external diagnostic tester comprising,

a program recognition and program loading device, wherein a program version contained in a connected control unit is queried and recognized by means of the program recognition device, and, if the program available in the motor vehicle and recognized via the diagnostic/test plug is not stored there in a latest and most current version, a respective most current version is loaded by the program loading device into a program storage device of the pertinent control unit of the motor vehicle, wherein the external diagnostic tester automatically establishes communication with a central dat[a] base[2] in order to check the program version and, if necessary, to obtain the current program version that applies for the control unit connected to the diagnostic tester and to store it there.

_____

[2] The term "central data base" was mistakenly misspelled by the United States Patent and Trademark Office as "central date base."  The term is referred elsewhere in the '313 Patent as "central data base," *see* Patent '313, 2:58, and the parties agree that the term should be spelled "central data base."

## B. Claim 2

2. The <u>external diagnostic tester</u> according to claim 1, wherein, in addition to the program for the control units in the motor vehicle having self-diagnostic means, a program for engine control, programs of control units of other systems and subsystems provided for in the motor vehicle are also checked and, if necessary, newly <u>loaded</u> or reprogrammed.

## C. Claim 3

3. The <u>external diagnostic tester</u> according to claim 1, wherein the <u>external diagnostic tester</u> <u>automatically</u> carries out a program version check and, if necessary, necessary programming.

## D. Claim 4

4. The <u>external diagnostic tester</u> according to claim 1, wherein the <u>external diagnostic tester</u> is equipped with the respective latest versions of necessary programs.

## E. Claim 5

5. The <u>external diagnostic tester</u> according to claim 1, wherein a communication takes place via a dedicated line, or wirelessly via mobile telecommunication from a workshop or the motor vehicle itself.

## D. Claim 6

6. The <u>external diagnostic tester</u> according to claim 1, wherein the <u>external diagnostic tester</u> is equipped with an <u>authorization</u> to check the <u>program version</u> currently available in the connected control unit of the motor vehicle, and, if necessary, to reprogram a corresponding program.

## III. STANDARD

Under *Markman*, a court conducting a patent infringement analysis undertakes a two-step process. First, the court must determine the meaning and scope of the protected patents. This step, claim construction, is a question of law for the court. *Markman*, 52 F.3d at 976, 979. Once the court has interpreted the claims at issue, the second step requires comparing the properly construed claim and the accused device to

3

determine whether the accused device is infringing.  *Id.* at 976.  The infringement analysis, generally, is for a jury.

"The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims."  *Embrex, Inc., v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (quotation omitted).  In construing the claim, the court should keep in mind that "the language of the claim defines the scope of the protected invention."  *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns, Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995).  For this reason, "'resort must be had in the first instance to the words of the claim,' words [which are ascribed] their ordinary meaning unless it appears the inventor used them otherwise."  *Id.* at 620 (quoting *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759 (Fed. Cir. 1984)).  Further, "it is equally 'fundamental that claims are to be construed in light of the specifications and both are to be read with a view to ascertaining the invention.'"  *Id.* (quoting *United States v. Adams*, 383 U.S. 39, 49 (1966)).

In construing a claim, the court begins with an analysis of the ordinary meaning of the disputed claim terms.  The terms used in the claims bear a heavy presumption that they mean what they say, having the ordinary meaning that would be attributed to those words by persons having ordinary skill in the relevant art.  *Tex. Digital Sys.*, *Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002).  The court can then look to other intrinsic evidence, including the specification and the prosecution history if in evidence.  *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).

After exhausting the available intrinsic evidence, the court may also consider extrinsic evidence "to aid [it] in coming to a correct conclusion as to the true meaning of the language employed in the patent." *Markman*, 52 F.3d at 980 (quotations omitted). Extrinsic evidence consists of all evidence external to the patent and prosecution history, including testimony of inventors or experts, dictionaries, and learned treatises. *Id.* "However, extrinsic evidence cannot be used to contradict the established meaning of the claim language." *Gart v. Logitech,* 254 F.3d 1334, 1340 (Fed. Cir. 2001). In sum, "the ordinary and customary meaning of a claim term may be determined by reviewing a variety of sources." *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003). These sources "include the claims themselves, dictionaries and treatises, and the written description, the drawings, and the prosecution history." *Id.* (internal citations omitted); *see also Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1378 (Fed. Cir. 2002) (noting that dictionaries are often helpful in ascertaining plain and ordinary meaning of claim language).

It is well established that 35 U.S.C. § 112 permits inventors to use generic means expression in claim limitations, provided that they clearly identify and describe the corresponding structures to perform the stated function in the patent specification. *Atmel v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir. 1999). Paragraph 6 of 35 U.S.C. § 112 permits the use of means-plus-function language, stating:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

5

35 U.S.C. § 112, ¶ 6. The court interprets claims written in means-plus-function form to include only the "structure set forth in the specification and its equivalents." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998).

In construing means-plus-function claim limitations, a court employs a two-step process. First, the court identifies the particular function claimed, often called the stated or claimed function. Second, it identifies the "corresponding structure, material, or acts described [by the claimant] in the specification." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001); *see also Asyst Tech., Inc. v. Empak, Inc.,* 268 F.3d 1364, 1369-70 (Fed. Cir. 2001) (describing the two steps in construing a means-plus-function limitation). A party choosing to write a claim in the means-plus-function format, contrary to the ordinary situation, is limited to claiming the corresponding structure actually disclosed in the specification and its equivalents. *Kahn*, 135 F.3d at 1476.

Furthermore, "a structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). "Whether or not the specification adequately sets forth structure corresponding to the claimed function necessitates consideration of that disclosure from the viewpoint of one skilled in the art." *See, e.g.*, *Budde*, 250 F.3d at 1376 (citing *In re Ghiron*, 442 F.2d 985, 991 (C.C.P.A. 1971) (noting that functional-type block diagrams may be acceptable corresponding structure if they serve in conjunction with the rest of the specification to enable a person skilled in the art to make a selection and practice the claimed invention)).

## IV. DISCUSSION

6

A.      *"external diagnostic tester"* (Claims 1, 2, 3, 4, 5, 6)

The "external diagnostic tester" is the subject of the '313 Patent.  The term

begins all six claims and is also referenced throughout each claim.  Bosch contends that

"external diagnostic tester" means "a device capable of temporarily connecting to or

communicating with a motor vehicle and capable of performing, controlling or aiding in

an investigation into the cause or nature of a condition, situation, or problem affecting a

control unit of the motor vehicle."  (Dkt. # 103-5 at Pg ID 5423-24.)  Defendants offer a

similar construction: "a device capable of temporarily connecting to a motor vehicle and

capable of performing an investigation into the cause or nature of a condition, situation,

or problem affecting a programable control unit of the motor vehicle."  (*Id.*)  There are

three differences between the competing constructions.  The first is whether an

"external diagnostic tester" can "aid" in an investigation of a control unit in addition to

performing the investigation on its own.  Claim 1 states that the "programmable control

units" have "self-diagnostic means."  ('313 Patent, 4:19-20.)  Bosch points to the

specification which explains that programmable control units "can contain self-diagnostic

means and control" and may conduct "self-diagnosis" in which "error codes are

generated and stored."  ('313 Patent, 1:11-14.)  Because the programmable control unit

can self-diagnose, both the control unit and the external diagnostic tester play a role in

testing the control unit.  Defendants' definition, however, excludes the control unit's self-

diagnostic capability by limiting the testing process to only the external diagnostic tester.

By including the term "aiding," Bosch's definition accurately reflects that an external

diagnostic tester may assist a programmable control unit in completing a diagnostic test.

7

Second, Bosch claims that, in addition to "connecting to" a motor vehicle, an external diagnostic tester could simply "communicat[e] with" a motor vehicle. However, neither the claim language, specification, or prosecution history suggest that the external diagnostic tester can communicate with a vehicle without it first being connected to the vehicle. Claim 1 recites, "An external diagnostic tester for motor vehicles . . . wherein the control units can be connected to the external diagnostic tester via a diagnostic/test plug in the motor vehicle." ('313 Patent, 4:18-22.) The specification describes the external diagnostic tester being connected to the vehicle before the program check begins. ('313 Patent, 1:61-64 ("[W]hen the external diagnostic tester . . . is connected, the programs available in the control units are automatically checked . . . .").) In filing claim amendments, the '313 applicants explained that "[t]he external diagnostic testing device, in use, is electrically connected with the motor vehicle-side control apparatus." (Dkt. # 55-3 at Pg ID 3243.) Therefore, the intrinsic evidence demonstrates that the external cannot merely "communicate with" a motor vehicle, but rather must be connected to the vehicle. The phrase "or communicating with" will be excluded from the construction of "external diagnostic tester."

The parties also differ on whether "programmable" should modify "control unit." In its first reference to "control units," Claim 1 identifies them as "programmable control units": "An external diagnostic tester for motor vehicles, the motor vehicles having *programmable* control units with self-diagnostic means, wherein the control units can be connected to the external diagnostic tester . . . ." ('313 Patent, 4:18-21) (emphasis added). When Claim 1 states that "the control units" are connected to the external

8

diagnostic tester, the language is referring to the previously mentioned "programmable control units." Thus, in order to remain faithful to the claim language, "programmable" will modify "control units" in the definition of "external diagnostic tester."

Accordingly, "external diagnostic tester" will be construed to mean "a device capable of temporarily connecting to a motor vehicle and capable of performing, controlling or aiding in an investigation into the cause or nature of a condition, situation, or problem affecting a programmable control unit of the motor vehicle."

### B. *"program recognition device"* (Claim 1)

Defendants argue that "program recognition device" should be construed as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. Claim 1 states, in part, "a program recognition . . . device, wherein a program version contained in a connected control unit is queried and recognized by *means of the program recognition device* . . . ." ('313 Patent, 4:24-27.) When a claim uses the word "means" to describe a limitation, the court "presume[s] that the inventor used the term advisedly to invoke the statutory mandates for means-plus-function clauses." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003) (citation omitted). While "means for" is the typical phrase that triggers the presumption, *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1584 (Fed. Cir. 1996), the presumption also applies to the phrase "means of," s*ee, e.g.*, *id.* at 1376 (holding that "means of" invoked the presumption.)

There are two ways in which the presumption may be overcome. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002). First, "a claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶ 6." *Id.* Here, looking to the claim language, the corresponding

9

function of "program recognition device" is "to query and recognize a program version contained in a programmable control unit of a motor vehicle."

The second way in which the presumption can be overcome is if the claim "recites sufficient structure or material for performing the function." *Allen*, 299 F.3d at 1347. The claim language is silent as to the structure for "program recognition device." It is unclear whether a "program recognition device" is comprised of computers, circuitry, software, or something else.

"A claim term recites sufficient structure if the term, as the name for the structure, has a reasonably well understood meaning in the art." *Allen*, 299 F.3d at 1347 (citations omitted). Courts consider dictionary definitions "to determine if a disputed term has achieved recognition as a noun denoting structure." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004). The parties have not provided, and the court has not identified, a dictionary defining "program recognition device." "Device" typically does not connote sufficiently definite structure. *Mass. Inst. of Techn. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998) (holding that "device" is "a generic structural term"). The modifiers "program" and "recognition" are not defined in the specification. While Bosch offers technical dictionary definitions of the terms "program" and "recognize," those definitions do not connote any structure to their respective terms that can be aggregated to disclose an overall structure for "program recognition device." *See* IBM Dictionary of Computing 535 (10th ed. 1994) (defining "program" as "a sequence of instructions suitable for processing by a computer"); The Random House Dictionary of the English Language

10

1611 (2d ed. 1987) (defining "recognize" as "to perceive as existing or true; to identify from knowledge of appearance or characteristic; to acknowledge or treat as valid"). "Program" and "recognition" do not provide any additional information regarding what comprises the "device." Therefore, "program recognition device" does not recite sufficient structure and is a means-plus-function limitation subject to § 112, ¶ 6. *See Mass. Inst.*, 462 F.3d at 1354 (holding that "colorant selection mechanism" invoked § 112, ¶ 6 because "mechanism" does not typically signify structure and "colorant selection," which was not defined in the specification and had no dictionary definition, did not have a generally understood meaning in the art).

Construing a means-plus-function claim limitation is a two-step process. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1317 (Fed. Cir. 2012). First, the claimed function must be determined. *Id.* at 1317 (citation omitted). The court has already determined, based upon the claim language, that the function of "program recognition device" is "to query and recognize a program version contained in a programmable control unit of a motor vehicle." At the second step, "the court must identify the corresponding structure in the written description of the patent that performs the function." *Id.* (citation omitted). "A structure disclosed in the specification qualifies as a 'corresponding structure' if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The specification for the '313 Patent does not provide a corresponding structure for "program recognition device." The specification is brief and does not include any diagrams, flowcharts, or algorithms. "Program recognition device" is discussed only in terms of its function, not its structure. (*See, e.g.*, '313 Patent, 2:18-22 ("[T]he external diagnostic tester is equipped with a program recognition

11

. . . device, and the program version contained in the connected control unit is queried and recognized using the program recognition device . . . .").)

In arguing that "program recognition device" has sufficient structure, Bosch relies on the affidavit of Wolfgang Wagner, a co-inventor of the '313 Patent, who declares that "program recognition device" had a generally understood meaning in the art when he filed the '313 Patent application and that, consequently, he did not need to define the term in the specification.  (Dkt. # 103-2 at Pg ID 5391 ¶ 23.)  Wagner further asserts that he has "hands-on experience" with various program recognition devices such as translators and converters.  (*Id.* ¶ 24.)

Bosch's reliance on Wanger's affidavit is unavailing.  "[I]nventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction." *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008).  Furthermore, even if Wagner was not the inventor of the '313 Patent, when determining whether a claim is indefinite "the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification."  *Noah*, 675 F.3d at 1312 (citation omitted).  The Federal Circuit has explained that "[t]he prohibition against using expert testimony in this manner is a direct consequence of the requirement that the specification itself adequately disclose the corresponding structure."  *Id.*

Bosch points to Defendants' previous claim construction briefing and argues that the claim language was "definite enough for Defendants to propose a construction on multiple occasions and identify evidence in support of that construction."  (Dkt. # 103 at Pg ID 5375.)  Bosch makes this identical argument two other times in its briefing with

12

respect to "program loading device" and "authorization," which Defendants also contend are indefinite.  Bosch's position is equivalent to suggesting that Defendants, in submitting papers consistent with the earliest provisions of the court's scheduling order, waived their right to present arguments consistent with later provisions, and is unpersuasive.  Defendants properly moved for leave to file supplemental briefing in order to argue that the terms "program recognition device," "program loading device," and "authorization" should be construed as means-plus-function terms pursuant to § 112, ¶ 6.  Bosch responded to the motion, and after considering the respective arguments, the court granted leave.  (Dkt. # 98.)  To now find that Defendants waived the argument that § 112, ¶ 6 should apply to the three terms would, effectively, vacate the court's order granting Defendants (and Bosch) leave to file supplemental briefing and render useless the time, effort, and client money expended on preparing the briefing.  The court will not do so.  Indeed, if the court considered Defendants' argument waived, it would never have granted leave in the first place.

When § 112, ¶ 6 is invoked, "[t]here must be structure in the specification." *Atmel*, 198 F.3d at 1382.  "Fulfillment of the § 112, ¶ 6 tradeoff cannot be satisfied when there is a total omission of structure."  *Id.*  Here, the corresponding structure of "program recognition device" is absent from the specification.  Under § 112, ¶ 6, "a means-plus-function clause is indefinite if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim."  *Noah*, 675 F.3d at 1312.  Without a corresponding structure, Defendants have met their burden of proving by "clear and convincing evidence" that "program recognition device" is indefinite.  *See Intel Corp. v. VIA Techs., Inc.*, 319 F.3d

13

1357, 1366 (Fed. Cir. 2003) ("Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence.")  Accordingly, "program recognition device" is indefinite, and consequently, Claim 1 and its dependent claims are also rendered indefinite.

    **C.**    *"program loading device"* **(Claim 1)**

Defendants argue that "program loading device" also invokes § 112, ¶ 6.  The claim language, in reference to "program loading device," does not use the word "means."  (*See* '313 Patent, 4:27-33 ("[I]f the program available in the motor vehicle and recognized via the diagnostic/test plug is not stored there in a latest and most current version, a respective most current version is loaded by the program loading device into a program storage device of the pertinent control unit of the motor vehicle.").)  Claim language that fails to use the word "means" creates a rebuttable presumption that § 112, ¶ 6 does not apply.  *Personalized Media*, 161 F.3d at 703-04.  The presumption can be rebutted "by showing that the claim element recited a function without reciting sufficient structure for performing that function."  *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000).  In determining whether a presumption is rebutted, "the focus remains on whether the claim recites sufficiently definite structure."  *Id.* (citation and alteration omitted).  "[T]he presumption flowing from the absence of the term "means " is a strong one that is not readily overcome."  *Inventio AG v. Thyssenkrupp Elevator Americas Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011).

A straightforward reading of the claim language provides that the corresponding function for "program loading device" is "to load the most current version of a program into a program storage device of the pertinent programmable control unit of the motor

14

vehicle."  However, for the same reasons that "program recognition device" did not recite sufficient structure, so too does "program loading device" fail.  The claim language does not disclose a structure for "program loading device."  "Program loading device" is not defined by any dictionary proffered to the court, and the definitions of "program" and "load" offered by Bosch do not connote structure, leaving "device" to remain a generic structural term.  *See*, *respectively*, IBM Dictionary of Computing 535 (10th ed. 1994) (defining "program" as "a sequence of instructions suitable for processing by a computer"); IBM Dictionary of Computing 390 (10th ed. 1994) (defining "load" as "to bring all or part of a computer program into memory from auxiliary storage so that the computer can run the program").  Accordingly, "program loading device," as a claim term that recites a function but not a sufficient structure, is properly construed as a means-plus-function limitation that invokes § 112, ¶ 6.

Turning to the specification, no corresponding structure is identified for "program loading device."  As it did with "program recognition device," the specification discusses only the function of "program loading device," but is silent regarding its structure.  (*See, e.g.*, '313 Patent, 3:25-28 ("[T]he most current verison is loaded into the program storage device of the corresponding control unit by a program loading device, with which the external diagnostic tester is also equipped.").)  Wagner, in his affidavit, asserts that he did not define "program loading device" in the specification because it had a generally understood meaning in the art when he filed the '313 Patent application.  As discussed *supra*, this averment is insufficient because an inventor's subjective intent has no bearing on how a claim should be construed.  *Howmedica*, 540 F.3d at 1347.

15

Because the specification does not disclose a corresponding structure for "program loading device," the term is indefinite.

### D.   *"queried"* (Claim 1)

Defendants rely on general dictionaries in arguing that "queried" simply means "questioned."  Webster's New World Dictionary of American English 1102 (3d ed. 1988) (defining "queried" as "to call in question; ask about"); The Random House Dictionary of the English Language 1584 (2d ed. 1987) (defining "queried" as "to ask or inquire about").  Bosch seeks a broader definition, arguing that "queried" means "requested, signaled or interrogated for triggering or eliciting a response."  In addition to citing The Random House Dictionary of the English Language, as did Defendants, Bosch cites a technical dictionary, which defines "query" as "a request for information from a file based on specified conditions."  IBM Dictionary of Computing 549 (10th ed. 1994). While the definition supports Bosch's inclusion of the term "requested," Bosch does not cite any dictionary that defines "queried" as "signaled or interrogated for triggering or eliciting a response."  Instead, Bosch simply contends that the phrase "requested, signaled or interrogated for triggering or eliciting a response" is more accurate than "questioned" in the context of the claim language, which uses "queried" in relation to a program version.  (*See* '313 Patent, 4:25-27 ("[A] program version contained in a connected control unit is queried and recognized by means of the program recognition device . . . .").)  Bosch argues that "questioned" would create ambiguity and confusion because a "program version" is a thing, not a person, and thus cannot be "questioned."

The court is not persuaded that the straightforward definition of "questioned" would confuse a jury.  Furthermore, Bosch does not identify any intrinsic or extrinsic

16

evidence to support the phrase "signaled or interrogated for triggering or eliciting a response."  However, the technical definition of "queried," which defined the term as "a request for information," provides more clarity than if "queried" were only defined as "questioned."  Incorporating the technical and general dictionary definitions, "queried" will be defined as "questioned or requested for information."  This definition accurately communicates the purpose of "queried" in the claim language, without using redundant or unnecessary terms that are not supported by the intrinsic or extrinsic evidence.

E.   *"recognized"* **(Claim 1)**

Defendants contend that "recognized" means "identified."  Bosch agrees that "identified" should be included in the definition, but offers a broader construction: "identified or acknowledged the existence, status or validity."  Both parties cite dictionary definitions that use the terms "acknowledge."  (Dkt. # 50-6 at Pg ID 2553 (Bosch citing The Random House Dictionary of the English Language 1611 (2d ed. 1987) defining "recognize" as "to acknowledge or treat as valid"; and Webster's Ninth New Collegiate Dictionary 984 (1985) defining "recognize" as "to acknowledge or take notice of in some definite way")); (Dkt. # 50-7 at Pg ID 2581 (Defendants citing Webster's New World Dictionary 1121 (3d ed. 1988) defining "recognize" as "to acknowledge the existence, validity, authority, or genuineness of").)  Defendants argue that including "acknowledge" would alter the meaning of "program recognition device" from a device that identifies a program to one that merely acknowledges that a program exists.  However, this argument is waived as Defendants abandoned their original construction of "program recognition device" for their current position that the phrase is indefinite under 35 U.S.C. § 112, ¶ 6.

17

Bosch seeks to include not just the word "acknowledge," but the phrase "acknowledged the existence, status or validity."  Bosch finds support for the terms "existence," "status," and "validity" in dictionary definitions.  *See* The Random House Dictionary of the English Language 1611 (2d ed. 1987) (defining "recognize" as "to perceive as *existing* or true; to acknowledge or treat as *valid*) (emphasis added); Webster's Ninth New Collegiate Dictionary 984 (1985) (defining "recognize" as "to admit as being of a particular *status*") (emphasis added).  The phrase "acknowledged the existence, status or validity" is therefore supported by the extrinsic evidence, and the court will adopt Bosch's construction.

### F.   *"loaded"* (Claims 1, 2)

The term "loaded" is used twice in the '313 Patent.  Claim 1 recites, "if the program available in the motor vehicle and recognized via the diagnostic/test plug is not stored there in a latest and most current version, a respective most current version is loaded by the program loading device into a program storage device of the pertinent control unit of the motor vehicle . . . ."  ('313 Patent, 4:27-33.)  Claim 2 uses "loaded" in a similar context, stating, "the external diagnostic tester . . . , wherein, . . . a program for engine control, programs of control units of other systems and subsystems provided for in the motor vehicle are checked and, if necessary, newly loaded or reprogrammed." ('313 Patent, 4:39-45.)  The parties offer similar definitions of the term.  Bosch argues that "loaded" means "fed or placed into main storage from external or auxiliary storage," while Defendants assert that it means "bringing a computer program into main storage from external or auxiliary storage."  The dispute concerns whether "fed or placed" or "brought" most appropriately describe the action of "loading."

18

The parties primarily rely on extrinsic evidence to support their respective positions.  Both cite The Random House Dictionary of English Language which, in the context of computers, defines "load" to mean "to bring (a program or data) into main storage from external or auxiliary storage."  The Random House Dictionary of English Language 1126 (2d ed. 1987).  Bosch also cites the IBM Dictionary of Computing which offers two relevant definitions.  The first supports Bosch's proposed construction by defining "load" as "[t]o feed data into a database."  IBM Dictionary of Computing 390 (10th ed. 1994).  Yet this definition is inapplicable to the term "load" within the context of the '313 Patent because it refers to data being inputted into a database.  The language in Clams 1 and 2, on the other hand, uses "load" in the context of loading a program into a control unit.  The second definition provided by the IBM Dictionary of Computing is better suited to the '313 Patent by defining "load" within the context of computer programs.  Notably, the definition defines "load" using the verb "bring": "to bring all or part of a computer program into memory from auxiliary storage so that the computer can run the program."  *Id.*  Bosch does not offer any dictionary definition that defines "loaded" using the word "placed."

The general and technical dictionary definitions of "loaded" in the context of computer programs supports the use of the term "brought."  Accordingly, the court will adopt Defendants' proposed construction.

G.    *"automatically"* (Claims 1, 3)

The parties disagree whether "automatically" allows for minimal human intervention.  Defendants contend that "automatically" means "starting, operating, moving, etc. independently or by itself."  Within the context of the '313 Patent claims,

19

Defendants maintain that "automatically" means "requires no input or work expenditure by an operator or service personnel."  Bosch proposes that "automatically" means "pertaining to a process or device that functions in response to an action of a person with minimal reliance on further intervention by that person."

Beginning with the claim language, Claim 1 recites, in relevant part, "An external diagnostic tester . . . *comprising*, a program recognition and program loading device, . . . wherein the external diagnostic tester automatically establishes communication with a central data base in order to check the program version and, if necessary, to obtain the current program version that applies for the control unit connected to the diagnostic tester and to store it there."  ('313 Patent, 4:18-38) (emphasis added).  "The transitional term 'comprising' . . . is inclusive or open-ended and does not exclude additional, unrecited elements or method steps."  *CollegeNet, Inc. v. ApplyYourslef, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005).  In *CollegeNet*, the Federal Circuit construed the term "automatically" within a claim that used the word "comprising" but did not expressly provide for human intervention.  *Id.* at 1235.  The court held that "'comprising' suggests that additional, unrecited elements are not excluded" and that "[s]uch elements could include human actions to expressly initiate the [functions of the patented machine]."  *Id.*

Consistent with the '313 Patent's use of the term "comprising," the parties agree that human intervention is necessary before the external diagnostic tester can "automatically" establish communication with a central database.  Specifically, the parties recognize that a service technician is needed to connect and disconnect the external diagnostic tester to the motor vehicle, whether that connection is done physically or wirelessly.  The parties also agree that a technician must initiate the

20

tester—that is, inputting the parameters and starting the procedure by clicking something akin to a "start" button.

The key dispute is whether the '313 Patent allows for any further human intervention. Claim 3, the only other claim that employs "automatically," states, "the external diagnostic tester automatically carries out a program version check and, if necessary, necessary programming." ('313 Patent, 4:47-49.) Bosch argues that "automatically" allows for a minimal degree of human intervention such as monitoring the program check and interrupting the process if necessary. Defendants maintain that the '313 Patent prohibits any human intervention beyond initiating the tester. According to Defendants, including "minimal human intervention" in the construction of "automatically" would create a slippery slope, generating needless litigation concerning how much human intervention constitutes "minimal," and rendering meaningless the term "automatically."

The specification supports a construction of "automatically" that prohibits human intervention. The specification reads:

> [W]hen the external diagnostic tester available in the workshop is connected, the programs available in the control units are automatically checked to determine which version they contain and that, if necessary, a reprogramming of the programs available in the control units is carried out by the external diagnostic tester equipped accordingly. ('313 Patent, 1:61-67)

> No additional work expenditure is created for the service personnel by the automatic procedure of checking and if necessary, programming. During maintenance work, e.g., during an oil change, the diagnostic tester is left connected until the current program record has been programmed. ('313 Patent, 2:1-6)

> [T]he program version check and, if necessary, the required reprogramming, is carried out automatically by the external diagnostic tester. As a result, no particular attention is required by the maintenance and service personnel to

21

carry out this point during maintenance and service work.  ('313 Patent, 2:43-47)

The time required for reprogramming, if necessary, can be spent by the diagnostic tester when the oil is changed in the vehicle, for example.  ('313 Patent, 3:39-42)

The specification illustrates that the external diagnostic tester completes the reprogramming process without requiring any "particular attention" by service personnel and that the service personnel can perform other tasks, such as oil changes, while the procedure occurs.  There is no indication that service personnel would ever need to interrupt the procedure or monitor it to any extent.  Instead, the specification describes the diagnostic tester checking and reprogramming the motor vehicle's programs without any monitoring from service personnel.  ('313 Patent, 2:1-6 ("*No additional work* expenditure is created for the service personnel by the automatic procedure . . . .")(emphasis added).)

Bosch argues that this "no additional work" statement implies that service personnel are required to perform *some* work during the procedure, or else the word "additional" would be surplusage.  Thus, Bosch concludes that the "no additional work" statement suggests that "the checking procedure does not require, but may permit, intervention by service personnel that does not create additional work."  (Dkt. # 50 at Pg ID 2499.)  The court disagrees.  Any noticeable degree of intervention in monitoring the procedure would create "additional work" for the service personnel compared to not using the tester to check the motor vehicle.  By explaining that the automatic procedure creates "no additional work" for the service personnel and that "no particular attention" is needed, the specification illustrates that "automatically" does not allow for any human

22

intervention.  "Additional" in the specification compares the *absence* of work required to use an automatic device to the base line *presence* of work required to service the vehicle in other respects, *e.g.*, changing the oil.

The prosecution history does not indicate whether "automatically" excludes minimal human intervention.  The Examiner initially rejected each of the claims in view of Berra, U.S. Patent No. 5,278,759, ("Berra") among others.  The applicants filed claim amendments and sought to distinguish Berra which required a user to regularly monitor the device during reprogramming.  The applicants explained that, in Berra, "[n]o automatic retrieval of actual versions can take place," unlike the external diagnostic tester which could automatically complete the reprogramming process.  (Dkt. # 55-3 at Pg ID 3244.)  Based upon the '313 applicants' claim amendments, the Examiner allowed the claims, explaining:

> Although the prior art disclose [sic] several claimed limitations, one of the references teaches an external diagnostic tester for motor vehicles having programmable control units with self-diagnostic means, wherein the external diagnostic tester comprising a program recognition and program loading device for checking to see if the program available in the motor vehicle is the latest and most current version, and if not, the external diagnostic tester **automatically** establishes communication with a central data base in order to check the program version and to obtain the current program version that applies for the control unit connected to the external diagnostic tester and to store it here.

(Dkt. # 55-3 at Pg ID 3251) (emphasis by Examiner).  The Examiner substantially relied upon the external diagnostic tester's ability to automatically communicate with a central database and conduct reprogramming in distinguishing the '313 Patent from Berra.  But Berra concerned a device that required *regular* monitoring during reprogramming. Here, the dispute is whether the '313 Patent allows for *minimal* human intervention,

23

such as periodic monitoring and interrupting the procedure. The prosecution history, at most, constitutes a disclaimer of a tester that required regular monitoring during reprogramming. Thus, the Examiner's use of the term "automatically" to distinguish Berra is ultimately uninformative.

Dictionary definitions, however, provide further support that "automatically" should be construed to exclude human intervention after the procedure has been initiated. The general dictionary definitions indicate that "automatically" should be defined without human intervention. Webster's New World Dictionary 93 (3d ed. 1988) (defining "automatic" in the context of machinery as "moving, operating etc. by itself; regulating itself"); The Random House Dictionary of the English Language 140 (2d ed. 1987) (defining "automatic" as "having the capability of starting operating, moving, etc., independently"). Both the IBM Dictionary of Computing (10th ed. 1994) and the IEEE Standard Dictionary of Electrical and Electronic Terms 63 (3d ed. 1984) define "automatic" as "pertaining to a process or device that, under specified conditions, functions without intervention by a human operator." "Under specified conditions" could reasonably be interpreted to mean that the process needs to be set up and initiated before it functions without human intervention.

Though not directly on point, the parties also cite technical dictionary definitions of various types of automatic instruments to support their respective positions. A review of these definitions shows that most automatic instruments do not allow for, or explicitly exclude, human intervention. *See, e.g.*, IEEE Standard Dictionary of Electrical and Electronics Terms 63 (3d ed. 1984) (defining "automatic computer" as "a computer that can perform a sequence of operations *without intervention by a human operator*")

24

(emphasis added); *id.* at 66 (defining "automatic system" as "a system in which the operations are preformed by electrically controlled devices *without the intervention of operators*) (emphasis added). Bosch identifies only one definition of an automatic instrument that allows for minimal human intervention. *See id.* (defining "automatic test equipment" as "equipment that is designed to conduct analysis of functional or static parameters to evaluate the degree of performance degradation and may be designed to perform fault isolation of unit malfunctions. The decision making, control, or evaluative functions are conducted with *minimum reliance on human intervention.*") (emphasis added). Bosch argues that the definition of "automatic test equipment" is more instructive than the definitions of "automatic" because the '313 Patent concerns a diagnostic tester. But the parties dispute the construction of the term "automatically," not "automatic test equipment"; it is the former that requires judicial construction. The definition of "automatic test equipment" does not outweigh the general and technical dictionary definitions of "automatically" that prohibit human intervention after a process has been initiated.

The claim language, specification, and relevant dictionary definitions support the notion that "automatically" does not allow for human intervention after the external diagnostic tester has been initiated. Therefore, "automatically" will be construed to mean "starting, operating, moving, etc. independently or by itself."

**H.** ***"wherein the external diagnostic tester automatically establishes communication with a central data base in order to check the program version and, if necessary, to obtain the current program version that applies for the control unit connected to the diagnostic tester and to store it there"* (Claim 1)**

25

Bosch argues that the above phrase does not require construction.  Defendants assert that the phrase requires construction because it is potentially unclear, specifically in regards to what "it" and "there" refer.  The primary dispute, however, concerns what phrases are modified by the term "automatically."

"Automatically" appears twice in the '313 Patent.  Claim 3 recites, "the external diagnostic tester carries out a program version check and, if necessary, necessary programming."  ('313 Patent, 4:46-49.)  The parties agree that, within Claim 3, "automatically" modifies "carries out a program check" and "necessary programming." Claim 1 provides the more controversial appearance of the term "automatically:

> An external diagnostic tester . . . comprising, a program recognition and program loading device, . . . wherein the external diagnostic tester automatically establishes communication with a central data base in order to check the program version and, if necessary, to obtain the current program version that applies for the control unit connected to the diagnostic tester and to store it there.

('313 Patent, 4:18-38.)  Bosch argues that "automatically" only modifies "establishes communication with a central data base."  Defendants claim that it should also modify (1) "to check the program version," (2) "to obtain the current program version," and (3) "to store [the new program version in the vehicle's control unit]."  Defendants propose the following construction:

> The external diagnostic tester *automatically* establishes communication with the central database to check the program version stored in the central database with the program version stored in the programmable control unit of the vehicle.  If the program stored in the program storage device of the programmable control unit is not the latest version of the program, the program loading device *automatically* loads the current version of the program from the central database onto the program storage device of the programmable control unit of the vehicle.  These automatic procedures require no input or work expenditure by an operator or service personnel.

26

(Dkt. # 103-5 at Pg ID 5424-25) (emphasis added).

During oral argument, Bosch averred that pursuant to Claim 1, the sole

independent claim of the '313 Patent, the only procedure that must be automatically

completed by the external diagnostic tester is establishing communication with a central

database.  That is, after the tester is connected to the programmable control unit of a

vehicle and initiated, the tester must automatically communicate with the central

database, but the remaining steps—checking the program version, obtaining the current

program version, and storing the current program version in the vehicle's control

unit—could be done manually by service personnel.

Bosch's interpretation of Claim 1 is inconsistent with the specification, which

repeatedly describes the external diagnostic tester automatically performing all of the

steps for completing the diagnostic check:

> In contrast to the prior art, the diagnostic device according to the invention
> has the advantage that, during regular maintenance of the motor vehicle in
> the workshop, when the external diagnostic tester available in the workshop
> is connected, the programs available in the control units are automatically
> checked to determine which version they contain and that, if necessary, a
> reprogramming of the programs available in the control units is carried out by
> the external diagnostic tester equipped accordingly . . . . ('313 Patent, 1:59-
> 67)

> No additional work expenditure is created for the service personnel by the
> automatic procedure of checking and if necessary, programming.  During
> maintenance work, e.g., during an oil change, the diagnostic tester is left
> connected until the current program record has been programmed.  ('313
> Patent, 2:1-6)

> In very suitable and advantageous embodiment and further development
> of the diagnostic tester according to the invention, the program version
> check and, if necessary, the required reprogramming, is carried out
> automatically by the external diagnostic tester.  As a result, no particular
> attention is required by the maintenance and service personnel to carry

27

out this point during maintenance and service work.  ('313 Patent, 2:41-47)

The specification never states that the external diagnostic tester, after automatically establishing communication with a central database, requires service personnel to manually check the program verison and complete reprogramming.  Instead, the specification highlights that the main advantage of the tester over prior art is its ability to automatically complete the reprogramming procedure.  Indeed, the specification explains that the "[o]bject of the present invention is to indicate a possibility according to which the respective current version is cost-effectively programmed in the control units in simple fashion."  ('313 Patent, 1:52-55.)

The prosecution history solidifies the notion that the external diagnostic tester automatically conducts the entire sequence of reprogramming steps, not just establishing communication with the central database.  The '313 Patent originally included seven claims.  The original Claim 1 did not reference the '313 Patent completing any procedures automatically.  (*See* Dkt. # 55-3 at Pg ID 3075.)  Original Claim 3 was nearly identical to the present version of Claim 3, stating that "the external diagnostic tester automatically carries out the program version check, and if necessary, the necessary reprogramming."  (*Id.*)  Original Claim 5 depended from Claims 1 and 3, reciting, "the external diagnostic tester automatically establishes communication with a central data base in order to check the program version and, if necessary, to obtain the current program version that applies for the control unit connected to the diagnostic tester and to store it there."  (*Id.* at Pg ID 3076.)  As discussed *supra*, the Examiner rejected the original seven claims in light of Berra, among other prior art.  In response,

28

the applicants emphasized the automatic nature of the '313 Patent.   The applicants distinguished Berra by noting that, "[i]n [Berra], only software versions stored in the 'diagnostic tool' can be used.  No automatic retrieval of actual versions can take place . . . ."  (*Id.* at Pg ID 3244.)  "[A]utomatic retrieval of actual versions" refers not just to establishing communication with a central database, but also to obtaining the most current version of the program.  The applicants then maintained that "Berra et al. actually teaches away from the present invention, because specific retractable program modules 32 are provided, whose actuality is dependent on a user of the apparatus also monitoring it regularly."  (*Id.*)  Thus, the applicants disclosed that service personnel would not need to manually operate the external diagnostic tester as they would when using the device claimed in Berra.  To clarify this point, the applicants cancelled original Claim 5, choosing instead to include it as a limitation in amended Claim 1.  (*Id.* at Pg ID 3240.)  In allowing the amended claims, the Examiner, in the reasons for allowance, emphasized that the automatic nature of the '313 Patent distinguished it from prior art. (*See id.* at Pg ID 3251.)

The prosecution history illustrates that the '313 Patent's ability to automatically complete a reprogramming procedure was a determinative factor for the Examiner in allowing the claims.  Bosch's contention that the '313 Patent requires the external diagnostic tester to complete only one step automatically—establishing communication with a central database—contradicts the prosecution history and strips the '313 Patent of the very quality that permitted its claims to be allowed.

Bosch argues that construing "automatically" in Claim 1 to modify (1) checking the program version, (2) obtaining the current program version, and (3) storing the new

program version would render Claim 3 redundant in violation of the doctrine of claim

differentiation. "'[C]laim differentiation' refers to the presumption that an independent

claim should not be construed as requiring a limitation added by a dependent claim."

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006).

However, "the presumption created by the doctrine of claim differentiation is not a hard

and fast rule and will be overcome by a contrary construction dictated by the written

description or the prosecution history." *Regents of Univ. of Cal. v. Dakocytomation Cal.,*

*Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008).  Here, the specification and prosecution

history establish that "automatically" should modify all of the steps an external

diagnostic tester takes to complete a program check.  Keeping in mind the construction

of "automatically," discussed *supra*, which is defined to exclude human intervention, the

phrase at issue in this section will be construed as follows:

> After it has been connected and initiated, the external diagnostic tester
> automatically establishes communication with the central data base to check
> the program version stored in the central data base with the program version
> stored in the programmable control unit of the vehicle.  If the program stored
> in the program storage device of the programmable control unit is not the
> latest version of the program, the program loading device automatically loads
> the current version of the program from the central data base onto the
> program storage device of the programmable control unit of the vehicle.

### I.      *"central data base"* (Claim 1)

Bosch argues that "central data base" means "a collection of related data

organized for ease of access of at least a portion of the data by a separately located

device."  Defendants contend that "central data base" is "a single collection of data that

contains the latest and most current version of software for a control unit of the vehicle.

The central database is spatially separated from the motor vehicle-side control

30

apparatus as well as from the diagnostic testing device."  There are two key differences between the proposed constructions.  First, while both parties agree that a "central database" is a collection of data, Bosch argues that the data must be "organized for ease of access" in order to distinguish "central data base" from any other collection of data.  Bosch cites two dictionary definitions to support its position.  *See* The American Heritage Dictionary of the English Language 475 (3d ed. 1996) (defining "database" as "a collection of data arranged for ease and speed of search and retrieval."); The Random House Dictionary of the English Language 508 (2d ed. 1989) (defining "database" as "a comprehensive collection of related data organized for convenient access, generally in a computer").  Defendants do not construe "central data base" to be an organized collection of data, but neither do Defendants argue that it would be incorrect to so define the term.  As the extrinsic evidence favors Bosch's construction, and Defendants do not offer a counter-argument, the construction of "central data base" will include "organized for ease of access of at least a portion of the data."

The second difference between the proposed constructions concerns how the definition should address that a "central data base" is physically separate and distinct from the external diagnostic tester.  Defendants rely on the prosecution history, where the applicants in their claim amendments explained that "[t]he external diagnostic testing device, in use, is electronically connected with the motor vehicle-side control apparatus, and also communicates from time to time with a central database that is *spatially separated from the motor vehicle-side control apparatus as well as from the diagnostic testing device*."  (Dkt. # 50-8 at Pg ID 2591) (emphasis added).  Defendants do not assert that this statement is a disavowal of claim scope, but rather that it

31

provides clarification for what constitutes a "central data base."  Bosch argues that using

the phrases "motor vehicle-side control apparatus" and "diagnostic testing device" will

confuse the jury.  Neither of those phrases are used in the claim language.  While

"motor vehicle-side control apparatus" and "diagnostic testing device" appear to be

synonyms for "programmable control unit" and "external diagnostic tester," respectively,

a jury will have to reconcile the competing phrases and determine if any differences

exist.  The court agrees that introducing the new terms could create unnecessary

confusion for a jury.  Bosch proposes to define "central data base" as "a separately

located device," which the court finds is a simple and clear way of explaining that the

database is physically distinct from the external diagnostic tester.  Thus, Bosch's

proposed construction will be adopted.

      **J.**     ***"program version"* (Claims 1, 6)**

      Bosch maintains that "program version" should be construed according to its

plain meaning, while Defendants contend that "program version" means "the version of

the software contained in the program storage device of the programmable control unit."

(Dkt. # 55 at pg ID 3044.)  The only substantive argument regarding the phrase's

construction was presented by Defendants who merely assert, without elaboration, that

their proposed construction is supported in the following lines of the specification:

> [T]he external diagnostic tester automatically checks, using the program
> recognition device simultaneously and preferably automatically, which
> program version and which data record is available in the control unit
> connected at the moment.

('313 Patent, 3:29-35.)  This portion of the specification provides no guidance as to how

"program version" should be construed, and certainly does not support Defendants'

construction.  Defendants' proposed construction introduces the term "software," which is not recited in the '313 Patent and, consequently, risks causing unnecessary confusion for the jury.  Assuming that "software" is a synonym for "program," Defendants' proposed construction seems uninformative as it defines "program version" as "the version of the program."  "Program version" is a simple, understandable term that will be construed according to its plain meaning.

### K.     "*authorization*" (Claim 6)

Defendants argue that "authorization" should be construed as a means-plus-function limitation and found indefinite.  Claim 6, in relevant part, recites that "the external diagnostic tester is equipped with an authorization to check the program version currently available in the connected control unit of the motor vehicle, and, if necessary, to reprogram a corresponding program."  ('313 Patent, 4:58-61.)  As the claim term does not use the word "means," there is a rebuttable presumption that § 112, ¶ 6 is not invoked.  *Personalized Media*, 161 F.3d at 703-04.  Defendants contend, and the court agrees, that "authorization" has the function "to check the program version currently available in the connected control unit of the motor vehicle and, if necessary, to reprogram a corresponding program."

Having found that "authorization" discloses a function, the question is whether "authorization" recites sufficient structure to avoid the application § 112, ¶ 6.  Like "program recognition device" and "program loading device," the claim language does not indicate what materials or structure comprises the "authorization."  However, "authorization" has a reasonably understood meaning to those skilled in the art of computer engineering.  Unlike the term "device," "authorization" is not a generic

33

structural term.  The IBM Dictionary of Computing provides a definition of "authorization" that connotes structure to the term.  IBM Dictionary of Computing 41 (10th ed. 1994) (defining "authorization" to mean "in computer security, the right granted to a user to communicate with or make use of a computer system.")  Simply because "authorization" does not conjure a specific structure does not undermine the conclusion that individuals skilled in the art would understand what is meant by term.  *See Personalized Media*, 161 F.3d at 705 ("[T]he fact that the term 'detector' does not connote a precise physical structure in the minds of those of skill in the art [does not] detract[] from the definiteness of structure.")

The presumption that "authorization" does not invoke § 112, ¶ 6 remains unrebutted.  Thus, the term is definite, and the court will adopt Bosch's proposed construction: "an electronic access control unit configured to grant or deny permission based on credentials or attributes."

## V. CLAIM CONSTRUCTION

In light of the above discussion and analysis, the disputed claim terms of U.S. Patent No. 6,782,313 are construed as follows:

| Claim Phrase | Court's Construction |
|---|---|
| "external diagnostic tester" (Claims 1-6) | "a device capable of temporarily connecting to a motor vehicle and capable of performing, controlling or aiding in an investigation into the cause or nature of a condition, situation, or problem affecting a programmable control unit of the motor vehicle" |

| "program recognition device" (Claim 1) | **Function:**<br><br>"to query and recognize a program version contained in a programmable control unit of a motor vehicle"<br><br>**Corresponding Structure:**<br><br>The term is indefinite because the specification does not disclose sufficient structure. |
|---|---|
| "program loading device" (Claim 1) | **Function:**<br><br>"to load the most current version of a program into a program storage device of the pertinent programmable control unit of the motor vehicle"<br><br>**Corresponding Structure:**<br><br>The term is indefinite because the specification does not disclose sufficient structure. |
| "queried" (Claim 1) | "questioned or requested for information" |
| "recognized" (Claim 1) | "identified or acknowledged the existence, status or validity" |
| "loaded" (Claims 1, 2) | "bringing a computer program into main storage from external or auxiliary storage" |
| "automatically" (Claims 1, 3) | "starting, operating, moving, etc. independently or by itself" |

| | |
|---|---|
| "wherein the external diagnostic tester automatically establishes communication with a central data base in order to check the program version and, if necessary, to obtain the current program version that applies for the control unit connected to the diagnostic tester and to store it there" (Claim 1) | "after it has been connected and initiated, the external diagnostic tester automatically establishes communication with the central data base to check the program version stored in the central data base with the program version stored in the programmable control unit of the vehicle.  If the program stored in the program storage device of the programmable control unit is not the latest version of the program, the program loading device automatically loads the current version of the program from the central data base onto the program storage device of the programmable control unit of the vehicle" |
| "central database" (Claim 1) | "a collection of related data organized for ease of access of at least a portion of the data by a separately located device" |
| "program version" (Claims 1, 6) | Plain meaning |
| "authorization" (Claim 6) | "an electronic access control unit configured to grant or deny permission based on credentials or attributes" |

**VI. CONCLUSION**

For the reasons set forth above, IT IS ORDERED that the claims of U.S. Patent No.

6,782,313 are CONSTRUED as set forth in the body of this order.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  August 9, 2013

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 9, 2013, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522